Trenton Roberts, Esq.
ROBERTS & WILLIE PLLC
212 Suntide Drive
Sunnyvale, TX 75182

Attorney for Plaintiff
MR. BRUCE JOINER

## U.S. DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| MR. BRUCE JOINER | Case No.: 3:17-cv-2692 |
| Plaintiff, | |
| v. | |
| UNITED STATES OF AMERICA | |
| Defendant. | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, through undersigned counsel, respectfully brings this action against the United States of America, and alleges as follows:

## I. INTRODUCTION

1.      On May 3, 2015, the Plaintiff was injured when Elton Simpson and Nadir Soofi, two members of the international terrorist organization ISIS, attempted to carry out a mass-shooting terrorist attack on behalf of ISIS at the Curtis Culwell Center in Garland, Texas.

2.      An agent of the United States Federal Bureau of Investigation ("FBI") solicited, encouraged, directed, and aided members of ISIS in planning and carrying out the May 3 attack.

## II. JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to the Federal Tort

Claims Act ("FTCA") and the Anti-Terrorism Act ("ATA"). Under an FTCA provision enacted at

28 U.S.C. § 1346(b)(1), a district court has jurisdiction over claims against the United States of

America for a personal injury caused by wrongful acts or omissions committed by the federal

government's agents. Pursuant to 28 U.S.C. § 2675(a), an FTCA claim was presented to the

"appropriate federal agency" (the FBI) on Oct. 12, 2016, and on April 5, the FBI issued a final

denial of the claim, [1] so the administrative remedy has been exhausted. Under an ATA provision

encoded at 18 U.S.C. § 2333(a), a national of the United States of America who is injured in his

person by reason of an act of international terrorism may sue therefor in an appropriate district

court of the United States.

4.      Venue is proper under 28 U.S.C. § 1402(b) because the Northern District of Texas is both

"the judicial district where the plaintiff resides [and] wherein the act[s] or omission[s] complained

of occurred."

## III. PARTIES

5.      Plaintiff Mr. Bruce Joiner is a United States citizen and a resident of Texas.

6.      Defendant United States of America is responsible for tortious acts committed by its agents

under 28 U.S.C. § 1346(b)(1). Defendant maintains an office at the Justice Department, Office of

the General Counsel, 950 Pennsylvania Avenue, NW Washington, DC 20530-0001. Pursuant to

Federal Rules of Civil Procedure 4(i), service of process may be accomplished on the United States

by sending a copy of each by registered or certified mail to Jefferson Beauregard Sessions III, in

---

[1] *See* Ex. A (Denial Letter).

his capacity as Attorney General of the United States Department of Justice, Room 5111 10th &
Constitution Avenue, NW Washington, D.C. 20530; sending a copy of each by registered or
certified mail to Civil Process Clerk U.S. Attorney for the Northern District of Texas, 1100
Commerce, 3rd Floor, Dallas, TX 75242-1699; and sending a copy of each by registered or
certified mail to John R. Parker, United States Attorney United States Attorney's Office Northern
District of Texas, Dallas Office 1100 Commerce Street, Third Floor Dallas, Texas 75242-1699.

## IV. STATEMENT OF FACTS

7.      For over eight years prior to the attack in Garland, the FBI spent millions of taxpayer
dollars and thousands of hours of man-power monitoring a radicalized Islamist named Elton
Simpson and his associates. Though the FBI had intimate knowledge of Simpson and his
associates' interest in committing acts of terrorism against American citizens (including plots to
attack shopping malls, military installations, and sporting events), the U.S. government made no
attempts to prosecute the terrorists and lock them safely away behind bars. Instead, the FBI took
proactive steps to assist the terrorists in attacking attendees at the "First Annual Muhammed Art
Exhibit and Contest" in Garland, TX. The FBI helped the terrorists obtain a weapon that was used
in the attack by lifting a hold during background check, incited the terrorists to attack the Garland
event, and even sent an agent to accompany the terrorists as they carried out the attack. In the
aftermath of the attack, former FBI Director James Comey lied to the American people by claiming
that Simpson was a "needle in a haystack" that was "invisible to us."[2] Even after it had come to
light that an undercover FBI agent had been communicating extensively with the terrorists during

---

[2] Kevin Johnson, *FBI director says Islamic State influence growing in U.S.*, USA TODAY, May 7, 2015,
https://www.usatoday.com/story/news/nation/2015/05/07/isis-attacks-us/70945534/.

the week prior to the event and had accompanied them as they carried out the attack, the FBI continued to assert that "[t]here was no advance knowledge of a plot to attack the cartoon drawing contest."[3]

*FBI Surveillance of Elton Simpson and Nadir Soofi*

8.     In the mid-2000s, the FBI began investigating Hassan Abu-Jihaad, a resident of Phoenix, AZ, on suspicion of his involvement in terrorism-related activities. While serving as a signalman in the U.S. Navy, Abu-Jihaad disclosed the locations and weaknesses of Navy ships to an online forum associated with Al Qaeda.[4] As part of the investigation, the FBI began surveillance of the Islamic Community Center of Phoenix ("ICCP"), which would go on to "serve[] as the starting point for a number of federal probes."[5]

9.     At the ICCP, Abu-Jihaad "met a drifter from Chicago, who converted to Islam and took the name Derrick Shareef. Abu-Jihaad invited Shareef to share his apartment. They lived together in 2004, when the FBI listened to them on wiretaps."[6]

10.    The U.S. government audiotaped a conversation between Abu-Jihaad and Shareef in which they talked about buying automatic rifles and plotted to attack a military recruiting station in Phoenix and Navy installations in San Diego. Shareef, however, "grew paranoid" and accused

---

[3] Anderson Cooper, 60 Minutes investigates first ISIS-claimed attack in U.S. and what the FBI knew, CBS NEWS, Mar. 26, 2017, http://www.cbsnews.com/news/terrorism-in-garland-texas-what-the-fbi-knew-before-the-2015-attack/.

[4] Sean Holstege, *Phoenix man guilty of aiding terrorists*, AZ. REPUB., Mar. 6, 2008, http://archive.azcentral.com/news/articles/0306abujihaad0306.html.

[5] Sean Holstege, *Phoenix mosque is a familiar FBI target*, AZ. REPUB., May 7, 2015, http://www.azcentral.com/story/news/local/phoenix/2015/05/07/texas-terrorist-shooting-phoenix-mosque-abrk/70954634/.

[6] Sean Holstege & Matthew Casey, *How a terror hunt led to 5 Phoenix men*, AZ. REPUB., July 13, 2015, http://www.azcentral.com/story/news/local/phoenix/2015/07/13/global-terror-hunt-hits-phoenix/29970379/.

Abu-Jihaad of "losing his nerve" after they aborted a planned attack. "[T]he two roommates grew apart and Shareef, disillusioned, moved back to Illinois in 2006." The FBI would ultimately go on to arrest Shareef in Chicago in relation to a plot to set off hand grenades at a shopping mall during the Christmas rush.[7]

11.     The FBI's surveillance of Abu-Jihaad continued after Shareef moved out of his apartment, and the FBI noticed that Abu-Jihaad was "socializ[ing] a lot" with coworker and ICCP member Elton Simpson.[8]

12.     In March 2007, the FBI arrested Abu-Jihaad. He was charged with passing secrets and material support of terrorists and was eventually sentenced to 10 years in prison. But the FBI's investigation did not end with Abu-Jihaad's arrest. Instead, it continued with Simpson as the new focus.[9]

13.     The FBI recruited someone in the ICCP congregation to befriend Simpson. Usama Shami, president of the ICCP, would later comment that "everybody" knew who the FBI informant was because "[h]e was acting suspicious, [. . .] and we knew that he was not somebody that's a regular member, or somebody that's a convert."[10] Simpson, however, appeared to have not caught on to the fact that his new friend was an informant.

14.     The informant began cultivating Simpson's friendship and recorded conversations with him in 2007. "The more information he gave to the FBI, the more he got paid," and he eventually

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] Jason Trahan & Byron Harris, *Garland suspect had history with FBI counterterror unit*, WFAA, May 4, 2015, http://www.wfaa.com/news/local/investigates/garland-suspect-had-history-with-fbi-counterterror-unit/148894071.

turned over 1,500 hours of recorded conversations. Over the course of the investigation, the FBI paid the informant $132,000 in all.[11]

15.     During these recorded conversations, Simpson told the informant that he had an interest in traveling to Somalia to join Al-Shabaab, a designated terrorist organization.[12] Simpson discussed "the permissibility of doing the martyrdom operations" and "how they gonna use the car with bombs on it."[13] In the fall of 2009, he told the informant that he planned to travel to South Africa to enroll in a madrassa, and that the school was just a front to reach Somalia.[14]

16.     The FBI discovered Simpson had a plane ticket to South Africa and a visa application to enter that country. Federal agents interviewed him about his plan to leave the United States. Simpson denied that he planned to leave, so the FBI arrested him and charged him with lying to a federal agent. He was ultimately convicted and sentenced to three years' probation.[15]

17.     After his arrest, Simpson "had a hard time finding work," and "would sometimes sleep on the floor of the mosque because he had nowhere to stay."[16] He also became disillusioned with the ICCP, as "the Muslim community [began] avoiding him like the plague," and "the mosque declined to raise money for his legal defense."[17] One new mosque member, however, supported Simpson during his difficulties with the criminal case. The new member's name was Nadir Soofi.[18]

---

[11] *Id.*

[12] *Id.*

[13] Justin Rohrlich, *'Bye-Bye America:' The FBI's Secretly Taped Conversations of a Texas Gunman*, VICE, May 5, 2015, https://news.vice.com/article/bye-bye-america-the-fbis-secretly-taped-conversations-of-a-texas-gunman.

[14] *Id.*

[15] Holstege & Casey, *supra* note 6.

[16] *Id.*

[17] Holstege, *supra* note 5.

[18] Holstege & Casey, *supra* note 6.

18.     Soofi gave Simpson a job at a struggling pizzeria that he owned, and also allowed him to move into his apartment. At the time, Soofi, who had a troubled background that included misdemeanor drug and assault charges, "grew noticeably more religious." Soofi's mother would later state that Soofi told her about hiring Simpson, who, like Soofi, was devoutly Islamic and was trying to "rehabilitate" himself.[19]

19.     At "about the same time he met Simpson," Soofi attempted to purchase a handgun from an infamous gun dealership in Arizona that was at the center of the "Fast and Furious" federal gunwalking scandal.[20] At the time of the purchase, Soofi "fudged some facts on the form required of would-be gun buyers," and because of his "history of misdemeanor drug and assault charges, there was a chance his purchase might raise red flags in the federal screening process." Soofi's attempt to buy the gun "caught the attention of authorities, who slapped a seven-day hold on the transaction," but "for reasons that remain unclear, the hold was lifted after 24 hours, and Soofi got the 9-millimeter."[21] The FBI is responsible for the National Instant Criminal Background Check System (NICS) to verify that a potential purchaser is not prohibited from receiving or possessing a firearm.[22]

20.     For the next five years, Simpson and Soofi continued to live together. Another radicalized ICCP member named Abdul Malik Abdul Kareem, whom federal attorneys have described as "off-

---

[19] Dan Frosch & Ana Campy, *Mother of Texas Gunman Sought to Keep Son From Extremism*, WALL ST. J., May 6, 2015, http://www.wsj.com/articles/mother-of-texas-gunman-sought-to-keep-son-from-extremism-1430951298.

[20] Richard A. Serrano, *Garland, Texas, shooter bought gun in 2010 during Fast and Furious*, L.A. TIMES, Aug. 1, 2015, http://www.latimes.com/nation/la-na-garland-gun-20150801-story.html.

[21] *Id.*

[22] U.S. DEPT. OF JUSTICE, A REVIEW OF ATF'S OPERATION FAST AND FURIOUS AND RELATED MATTERS 11 N.8 (2012).

the-charts dangerous,"[23] also moved in with Simpson and Soofi. The FBI investigated the group

of men in 2012 on suspicion of plotting to attack the Super Bowl, during which "investigators

found several electronic documents linked to terrorism, including the Al Qaeda magazine

'*Inspire*,' material from the Global Islamic Media Front, and a video on 'Training That Makes

Killing Civilians Acceptable' that was on a flash drive" belonging to Simpson.[24]

*Attack on the Garland "Draw Mohammed" Contest*

21.     On January 7, 2015, Islamic terrorists gunned down twelve people at the office of the

French satirical magazine *Charlie Hebdo* in retaliation for the magazine's cartoon depictions of

the prophet Muhammad.[25] On January 17, 2015, an Islamic group held a conference titled "Stand

with the Prophet in Honor and Respect," which was aimed at Muslims who were frustrated with

"Islamophobes" defaming "the Prophet."[26] Opposition to cartoon depictions of Muhammad was a

central focus of the conference.[27] The conference was held at the Curtis Culwell Center, a venue

owned by the Garland Independent School District.[28]

22.     The "Stand with the Prophet" event drew criticism from Americans who felt that it was

coming too soon on the heels of the *Charlie Hebdo* attack. Pamela Geller, a free speech activist,

---

[23] Ryan Van Velzer & Jacques Billeaud, *FBI: Man tied to Texas shooting wanted to attack Super Bowl*, ASSOCIATED PRESS, Jun 18, 2015, *available at* http://www.azfamily.com/story/29342754/fbi-man-tied-to-texas-shooting-wanted-to-attack-super-bowl?clienttype=generic&mobilecgbypass.

[24] Brahm Resnik, FBI: Garland conspirator considered Super Bowl attack, NBC 12 News, June 16, 2015, http://www.12news.com/news/local/valley/fbi-garland-conspirator-considered-super-bowl-attack/184235305.

[25] Catherine Taibi, *These Are The Charlie Hebdo Cartoons That Terrorists Thought Were Worth Killing Over*, HUFF. POST, Jan. 7, 2015, http://www.huffingtonpost.com/2015/01/07/charlie-hebdo-cartoons-paris-french-newspaper-shooting_n_6429552.html.

[26] Merrill Hope, *Outcry Over Coming 'Stand with the Prophet' Rally at Texas Public School Center*, BREITBART, Jan. 14, 2015, http://www.breitbart.com/texas/2015/01/14/outcry-over-coming-stand-with-the-prophet-rally-at-texas-public-school-center/.

[27] *Id*.

[28] *Id*.

organized a large protest outside at the event.[29] Soon after, Ms. Geller announced that she would

host a "Draw the Prophet" competition at the same venue in May 2015.[30]

23.     Ms. Geller's contest generated significant press coverage leading up to the event,

particularly regarding the threat of violence. Several media outlets condemned it as "shameless

Muslim-baiting,"[31] and on her own website, Ms. Geller posted screenshots from Twitter of Islamic

users calling for an attack on the event.[32] In response to the security risk posed by the event,

Garland ISD charged Ms. Geller's group $10,000 for "40 extra officers at the site."[33]

24.     In March 2015, a South Carolina resident named Erick Jamal Hendricks began taking steps

to form an ISIS cell inside the U.S., using social media to recruit members.[34] His activities quickly

drew the attention of federal law enforcement officers. On March 24, 2015, an undercover FBI

agent (referred to by the FBI as "UCE-1") contacted Hendricks on social media, posing as a

Muslim who was interested in joining the ISIS cell.[35]

---

[29] Bob Price, *Pamela Geller: Muslims Trying to Restrict Free Speech in Texas*, BREITBART, Jan. 18, 2015, http://www.breitbart.com/texas/2015/01/18/pamela-geller-muslims-trying-to-restrict-free-speech-in-texas/.

[30] Bob Price, *$10,000 Muhammad Art and Cartoon Contest to be Held at Site of 'Stand With the Prophet' Conference in Texas*, BREITBART, Feb. 11, 2015, http://www.breitbart.com/texas/2015/02/11/10000-muhammad-art-and-cartoon-contest-to-be-held-at-site-of-stand-with-the-prophet-conference-in-texas/.

[31] Sarah Cascone, *Texas 'Draw the Prophet' Contest is Shameless Muslim-Baiting*, HUFF. POST, Feb. 13, 2015, http://www.huffingtonpost.com/2015/02/13/texas-draw-the-prophet-_n_6679256.html.

[32] Pam Geller, *Jihadis Call for Attacks on Cartoonists in United States, Australia*, PAMGELLER.COM, April 30, 2015, http://pamelageller.com/2015/04/jihadis-call-for-attacks-on-cartoonists-in-united-states-australia.html/ (showing a Twitter post stating "The brothers from the Charlie Hebdo attack did their part. It's time for brothers in the #US to do their part" and accompanied by a link to an article announcing the Garland Draw Mohammed event).

[33] Ray Leszcynski, *'Muhammad Art Exhibit' contract calls for 40 officers at Garland ISD site*, DALLAS MORNING NEWS, Feb. 17, 2015, http://thescoopblog.dallasnews.com/2015/02/muhammed-art-exhibit-contract-calls-for-40-officers-at-garland-isd-site.html/.

[34] Hare Aff. ¶ 4, August 2, 2016.

[35] *Id*. at ¶ 33.

25.     Hendricks put UCE-1 through a vetting process, which included a test of UCE-1's religious knowledge and an evaluation of UCE-1's social media account.[36] After Hendricks "determined that UCE-1 satisfied his (Hendricks) security concerns," Hendricks "permitted [UCE-1] to move to the 'next level.'"[37] Hendricks then told UCE-1 that he was affiliated with ISIS,[38] and asked UCE-1 to help recruit new members for a terror cell.[39]

26.     On April 23, 2015, Elton Simpson publicly discussed the upcoming Garland event in a series of tweets with Mohamed Abdullahi Hassan, an influential ISIS member operating in Somalia.[40] Simpson began the conversation by tagging Hassan in a tweet that stated "When will they ever learn? They are planning on selecting the best picture drawn of Rasulullah (saws) in Texas." Simpson's tweet included a link to a Breitbart article about the "Garland Draw Mohammed" event. Hassan retweeted Simpson's tweet, and followed up with his own tweet linking to the Breitbart article and commented: "The brothers from the Charlie Hebdo attack did their part. It's time for brothers in the #US to do their part." Hassan then followed up by posting pictures of several jihadis, including the Paris kosher market shooter, Amedy Coulibaly, with the message: "If only we had men like these brothers in the #States, our beloved Muhammad would not have been drawn."[41]

---

[36] *Id.*

[37] *Id.*

[38] *Id.* at ¶ 42.

[39] *Id.* at ¶ 34.

[40] Rukmini Callimachi, *Clues on Twitter Show Ties Between Texas Gunman and ISIS Network*, N.Y. TIMES, May 11, 2015, https://www.nytimes.com/2015/05/12/us/twitter-clues-show-ties-between-isis-and-garland-texas-gunman.html.

[41] Jim Sciutto et al., *Texas attacker tweeted with overseas terrorists*, CNN, May 6, 2015, http://edition.cnn.com/2015/05/05/politics/texas-attack-terror-tweets/index.html.

27.     On that same day, Hendricks noticed Simpson's tweets about the event in Garland. He contacted Simpson on Twitter and asked for Simpson's contact information for another social media account.[42] Hendricks then told UCE-1 to contact Simpson to "validate" Hendricks' identity (Simpson had accused Hendricks of being a spy[43]) and to explain to Simpson that Hendricks and UCE-1 "have been connecting brothers."[44]

28.     UCE-1 contacted Simpson per Hendricks' instructions. After some preliminary discussion about how long they had been Muslims, they began cryptically discussing the possibility of "organizing."[45]

29.     The following day (April 24, 2015), UCE-1 and Simpson were again chatting over social media. Early in the conversation, the two men discussed the need to be careful when communicating online. Simpson made "multiple references to the presence of spies online."[46]

30.     Later in that conversation, Simpson asked UCE-1, "Did u see that link I posted? About texas? Prob not." Simpson then shared a link about the upcoming "Draw Prophet Muhammad Contest" in Garland, Texas. After Simpson shared the link, the conversation proceeded as follows:

> UCE-1:      Tear up Texas.
>
> Simpson:    Bro, u don't have to say that… U know what happened in Paris… I think… Yes or no…?
>
> UCE-1:      Right.

---

[42] *Id.*

[43] *Id.* at ¶ 71.

[44] *Id.* at ¶ 63.

[45] *Id.* at ¶ 65-66.

[46] *Id.* at ¶ 66.

Simpson:      So that goes without saying… No need to be direct.[47]

31.      After Simpson chastised UCE-1 for being too "direct" in online communications, the two men continued with a discussion about the need to stay armed.[48]

32.      The FBI stated that "a week" before the Garland event took place (which would be April 26, 2015), Simpson's name was included in a routine[49] terrorism "bulletin" that was sent to law enforcement agencies around the country, and that "[a]n assistant chief in Garland was on the FBI's distribution list."[50] The bulletin, however, contained little specific information about Simpson, and the FBI did not reach out directly to the Garland Police Department to warn them about the threat Simpson posed.[51] The Garland police later said that "the FBI bulletin lacked details they could turn into action, and therefore it amounted to information rather than a warning."[52]

33.      On May 1, 2015, Hendricks "communicated with UCE-1 regarding the upcoming drawing the Prophet Mohammad contest in Garland, Texas." UCE-1 reminded Hendricks about Simpson's interest in the event, stating, "He told me that he tweeted a article about the drawing contest and then u hit him up about it." Hendricks replied, "You can link with him brother. That's your call."[53]

---

[47] *Id*. at ¶ 67.

[48] *Id*. at ¶ 68.

[49] Eva Ruth Moravec & Emily Schmall, *Police say they didn't see FBI bulletin before Texas attack*, ASSOCIATED PRESS, May 11, 2015, *available at* http://www.sandiegouniontribune.com/sdut-garland-police-to-discuss-muhammad-cartoon-2015may11-story.html ("The FBI routinely disseminates information about potential national security concerns to local law enforcement officials.").

[50] Todd J. Gillman, *Lawmaker: FBI gave police ample warning ahead of Garland jihad attack*, DALLAS MORNING NEWS, May 21, 2015, http://www.dallasnews.com/news/community-news/garland-mesquite/headlines/20150521-lawmaker-fbi-gave-police-ample-warning-ahead-of-garland-jihad-attack.ece.

[51] *Id*. ("'There was nothing that said these guys were on their way to Garland, Texas,' [Garland police spokesman Officer Joe] Harn said []. 'It was not a warning. There was not a warning.'")

[52] *Id*.

[53] Hare Aff. at ¶ 70.

34.     The next day (May 2, 2015), Hendricks and UCE-1 again chatted online about the upcoming Garland event. Hendricks wrote, "I wish someone could go to tx and harass them during the night;" "a good solid protest;" and "Unique one man protest." After Hendricks explained that he was unable to go because he was on the no-fly list and it was "too much driving," UCE-1 then volunteered to go. UCE-1 then asked, "Just me or any other brothers?" Hendricks responded, "See what you and bro [Simpson] can do," and added that Simpson "has another brother he knows" (presumably Soofi). Hendricks then provided UCE-1 with Simpson's alternate Twitter contact.[54]

35.     On May 3, 2015, the day of the Draw Muhammad contest, UCE-1 traveled to Garland to meet up with Simpson. That evening, Simpson, Soofi, and UCE-1 traveled together to the Curtis Culwell Center in two separate cars, with Simpson and Soofi in the lead car and UCE-1 following closely behind.[55] Simpson and Soofi were wearing body armor, and were equipped with three assault rifles, three handguns, and 1,500 rounds of ammunition.[56]

36.     Just before the event was set to begin,[57] the FBI sent another email bulletin which contained "a list of suspected extremists who [. . .] were interested in the event."[58] The bulletin included information about "Simpson's general interest" in the event, along with a "photo and possible vehicle license plate,"[59] but it gave "no notice that he might be headed that way or planning an

---

[54] *Id*. at ¶ 71.

[55] Alex Pfeiffer, *FBI Undercover Agent Was In Car Behind Terrorists And Failed To Stop Attack*, DAILY CALLER, Mar. 27, 2017, http://dailycaller.com/2017/03/27/fbi-undercover-agent-was-in-car-behind-terrorists-and-failed-to-stop-attack/.

[56] *Charge links Garland shooters' trainer to ISIS list of U.S. troops*, DALLAS MORNING NEWS, Dec. 25, 2016, http://www.dallasnews.com/news/local-news/20151225-charge-links-garland-shooters-trainer-to-isis-list-of-u.s.-troops.ece.

[57] The FBI said the bulletin was sent "three hours" before the attack occurred, which was just before 7pm. The event started at 5pm.

[58] Evan Perez, Pamela Brown and Jim Sciutto, *Texas attacker had private conversations with known terrorists*, CNN, May 7, 2015, http://edition.cnn.com/2015/05/07/politics/fbi-warning-elton-simpson-cartoon-event-attack/index.html.

[59] *Id.*

attack on the draw-Muhammad gathering."[60] Former FBI Director James Comey would later claim that "[a]t the time, the FBI had no reason to believe that Simpson intended to attack the event."[61] The Garland Police Department's security operations for the event were already underway when the email bulletin was sent, and was "one of many emails sent [to the Department] on that day,"[62] so "no one saw [the email] until after the attack."[63] The numerous FBI agents on the ground at the event made no effort to alert local law enforcement officials that Simpson posed an imminent threat.

37.    After the event started, UCE-1 messaged Hendricks and told him that he was "in the vicinity." Hendricks responded, "If you see that pig [Geller] make your 'voice' heard against her," and then asked numerous questions about the size of the crowd, the building, security, and media presence.[64] When UCE-1 texted Hendricks that there was not a lot of activity outside the center, Hendricks texted back that he should wait until the attendees were outside to attack. UCE-1's last message stated "OK let me let u go n see how close I can get."[65]

38.    UCE-1, Simpson, and Soofi then approached the entrance to the convention center's rear parking lot in their vehicles. The Garland police had erected a barricade at that entrance, which was guarded by Garland police officer Gregory Stevens and the Plaintiff. The Plaintiff, who was

---

[60] Wade Goodwyn, *Texas Police Were Warned About Gunmen At Muhammad Cartoon Event — And They Weren't*, NPR, May 11, 2015, http://www.npr.org/sections/thetwo-way/2015/05/11/406025002/texas-police-were-warned-about-gunmen-at-muhammad-cartoon-event-and-they-werent.

[61] Pete Williams, *FBI Alerted Garland Police About Elton Simpson Hours Before Shooting*, NBC NEWS, May 8, 2015, http://www.nbcnews.com/news/us-news/fbi-says-it-alerted-garland-police-about-elton-simpson-n355526.

[62] Moravec & Schmall, *supra* note 49.

[63] *Garland police say FBI's warning wasn't specific about a threat*, FOX 4 NEWS, May 11, 2015, http://www.fox4news.com/news/1820418-story.

[64] Hare Aff. at ¶ 72.

[65] Id. at ¶ 73.

"dressed in a law enforcement-style uniform but was unarmed,"[66] was at the checkpoint "to check the identification of those coming in."[67] Former FBI Director Comey would later concede that the two officers were not "aware of the bulletin" about Simpson that the FBI sent shortly before the event started.[68]

39.     As UCE-1, Simpson, and Soofi approached the entrance, UCE-1 snapped a photograph of the police barricade on his cell phone. Officer Stevens and the Plaintiff can be seen in the photograph. Seconds later,[69] Simpson's vehicle pulled up at the police barricade and stopped, and the Plaintiff "walked up to [the] suspicious car"[70] to check the passengers' IDs. Simpson and Soofi then jumped out of their vehicle and opened fire on Officer Stevens and the Plaintiff.[71]

40.     The Plaintiff "dove for cover, but was shot in the leg. Officer Greg Stevens returned fire with his handgun." Other law enforcement officers who were nearby quickly converged on the scene. "[B]oth terrorists [were] mortally wounded by Officer Stevens," and a "SWAT team shot them both in the head" to finish them off.[72]

---

[66] Pete D'Amato, *Security guard shot in the leg by gunmen at anti-Islam event had been hired by organizers from local school to provide extra protection*, DAILY MAIL, May 4, 2015, http://www.dailymail.co.uk/news/article-3066865/Officials-release-security-guard-injured-two-armed-attackers-Mohammed-art-event.html.

[67] Greg Botelho, *Texas shooting: Outgunned traffic officer stopped 2 attackers*, CNN, May 6, 2015, http://edition.cnn.com/2015/05/05/us/texas-police-shooting-hero/.

[68] Williams, *supra* note 61.

[69] Naomi Martin, *Security guard injured in Garland terror attack tormented by belief that FBI knew of ISIS plot*, DALLAS MORNING NEWS, May 26, 2017, https://www.dallasnews.com/news/crime/2017/05/26/victim-garland-terror-attack-tormented-belief-fbi-knew-isis-plot.

[70] J.D. Miles, *Garland ISD Security Guard Shares Story Of Being Shot In Attack Exclusively With CBS11*, CBS DFW, May 12, 2015, http://dfw.cbslocal.com/2015/05/12/garland-isd-security-guard-shares-story-of-being-shot-in-attack-exclusively-with-cbs11/.

[71] *Id.*

[72] Anderson Cooper, 60 Minutes investigates first ISIS-claimed attack in U.S. and what the FBI knew, CBS NEWS, Mar. 26, 2017, http://www.cbsnews.com/news/terrorism-in-garland-texas-what-the-fbi-knew-before-the-2015-attack/.

41.     UCE-1 attempted to flee the scene, but he "was stopped at gunpoint by Garland police."[73] He was dressed in "Middle Eastern attire,"[74] and the police almost killed him in the heat of the moment. He "had his life saved by claiming he was an FBI agent."[75]

42.     As UCE-1 was being questioned by local police, FBI agents suddenly arrived and stopped the interview. The FBI agents placed a hood over UCE-1's head, then whisked him away to another location.[76] The FBI then confiscated all video footage of the event.

43.     A day after the attack, the Department of Justice sent an "urgent firearms disposition request" to Lone Wolf Trading Co., the Fast and Furious-linked gun shop in Phoenix, seeking more information about the gun that Soofi had purchased after the FBI proactively lifted a hold on the sale.[77] Though pressed by the media and by Senate investigators, "[t]he FBI so far has refused to release any details, including serial numbers, about the weapons used in Garland by Soofi and Simpson." The request "raising the chilling possibility that a gun sold during the botched Fast and Furious operation ended up being used in a terrorist attack against Americans."[78]

44.     Two days later (May 5, 2015), during an "official radio broadcast," ISIS claimed responsibility for the Garland attack. The ISIS radio announcer referred to Simpson and Soofi as

---

[73] *Id.*

[74] J.D. Miles, *Security Guard Wounded In ISIS Attack: "FBI Responsible"*, CBS DFW, Nov. 3, 2016, http://dfw.cbslocal.com/2016/11/03/security-guard-wounded-in-isis-attack-fbi-responsible/.

[75] *Id.*

[76] *Id.*

[77] *See supra* ¶19.

[78] Richard A. Serrano, *Garland, Texas, shooter bought gun in 2010 during Fast and Furious*, L.A. TIMES, Aug. 1, 2015, http://www.latimes.com/nation/la-na-garland-gun-20150801-story.html.

the terror group's "soldiers" and "brothers." As noted by CNN, "[i]t appeared to be the first time that ISIS claimed responsibility for an attack in the U.S."[79]

45.     That same day (May 5, 2015), Hendricks posted a statement praising Simpson and Soofi on justpaste.it,[80] a website that is notorious for its popularity among ISIS sympathizers.[81] In the statement, Hendricks described the deceased gunmen as "a new Muslim of 2 years and another of 11 years."[82] The FBI believes the reference to "a new Muslim of 2 years" indicates that Hendricks mistakenly believed that UCE-1 had been one of the gunmen killed in the attack. UCE-1 had previously described himself in conversations with Hendricks as being a convert from two years before, while Soofi had been raised a Muslim and Simpson had "informed UCE-1 that he had been a Muslim for 11 years."[83]

46.     Later that day (May 5, 2015), Hendricks reached out to UCE-1 through social media. Hendricks first verified UCE-1's identity by requesting that UCE-1 provide a secret code, then started discussing the attacks. UCE-1 told Hendricks that the "Cops almost shot me," to which Hendricks responded, "Have you seen the just paste?" (apparently referring to the statement on justpaste.it.) Hendricks added that he thought UCE-1 had been killed in the attack, but then stated, "after I added up the facts I knew it wasn't u." When UCE-1 "continued to express concern that he/she was nearly killed in the attack," Hendricks responded, "I thought the same thing bro."[84]

---

[79] Sarah Burke & Alexander Smith, *Garland Shooting: ISIS Claims Responsibility for Attack*, CNN, May 6, 2015, http://www.nbcnews.com/news/us-news/isis-claims-responsibility-garland-texas-shooting-n353761.

[80] Hare Aff. at ¶ 75-76.

[81] Carmen Fishwick, *How a Polish student's website became an Isis propaganda tool: An information-sharing website run from a bedroom in Poland has become part of the militants' slick public relations operation*, GUARDIAN, Aug. 15, 2014, https://www.theguardian.com/world/2014/aug/15/-sp-polish-man-website-isis-propaganda-tool.

[82] Hare Aff. at ¶ 76.

[83] *Id*.

[84] *Id*. at ¶ 77.

47.    Over the next week, Hendricks and UCE-1 continued to chat online.  The two men discussed the recruitment of new members, and the possibility of buying land in the U.S. to establish an ISIS training camp.

48.    The press and the Garland Police Department soon began questioning if the FBI could have done more to prevent the attack.[85] Though the public did not know at that time about UCE-1's presence during the attack, the FBI's "bulletin" emails indicated that the FBI knew about Simpson's intentions. To address these criticisms, former FBI Director James Comey publicly defended the agency's actions.

49.    Comey claimed that "agents did not have specific information that Simpson had targeted the meeting."[86] He also said that the agency "didn't know [Simpson] had traveled from Phoenix to Texas, and had no indication he was planning an attack."[87] He compared Simpson to a "needle in a haystack" that was "invisible to us," and said Simpson was just one of many "Elton Simpsons out there that I have not found and I cannot see."[88]

50.    When the media pointed out that the email bulletins proved the agency actually was aware of Simpson, Comey refused to reveal "what specifically had prompted the bureau to warn the Garland police […] about Mr. Simpson."[89] Comey conceded that "the FBI had seen [Simpson's] social media comments referencing the event,"[90] but downplayed this by stating that there are

---

[85] Gillman, *supra* note 46.

[86] Kevin Johnson, *FBI director says Islamic State influence growing in U.S.*, USA TODAY, May 7, 2015, https://www.usatoday.com/story/news/nation/2015/05/07/isis-attacks-us/70945534/.

[87] Perez et al., *supra* note 58.

[88] Johnson, *supra* note 86.

[89] Scott Shane, *F.B.I. Says It Sent Warning on One Gunman in Attack at Texas Gathering*, N.Y. TIMES, May 7, 2015, http://www.nytimes.com/2015/05/08/us/fbi-says-it-warned-of-gunman-in-garland-texas-attack.html.

[90] Perez et al., *supra* note 58.

"hundreds, or perhaps thousands, of people in the United States who are following the Islamic State on social media."[91] Even though Comey cited the bulletin as proof that the agency had given adequate warning to the Garland Police Department,[92] he admitted[93] that there was "no indication that information made it to officers on the street, or otherwise played a role in the quick reaction" of law enforcement officers to the attack.[94]

51.     U.S. House Homeland Security Committee chairman Michael McCaul would end up speaking out in Comey's defense. In doing so, however, he revealed information that undermined the FBI's narrative that it did not know Simpson had traveled from Phoenix to Texas. In defending the FBI against claims that they did not give sufficient warning to Garland police, Chairman McCaul stated the following:

> For a variety of reasons I can't get into, [Simpson] got back on the radar of the FBI. It was noticed that he had left his residence in Phoenix. This is where law enforcement actually worked. They sent out a joint intelligence bulletin — Homeland Security, FBI — about the art cartoon contest a week in advance, to all law enforcement saying stay on the lookout, anticipating clearly this kind of activity will provoke a response.[95]

52.     Six months later and half a world away, another group of ISIS-inspired terrorists plotted a very similar type of attack on crowded public gatherings in Paris, France. Tragically, the terrorists succeeded this time in carrying out a mass shooting, killing 130 people.[96] According to law enforcement sources, one of the guns used in the Paris attack was, like the gun used in Garland,

---

[91] Shane, *supra* note 89.

[92] Williams, *supra* note 61.

[93] *Id.* (quoting Comey as saying he did not believe law officers at the event were "aware of the bulletin").

[94] Perez et al., *supra* note 58.

[95] Gillman, *supra* note 50 (emphasis added).

[96] CNN Library, *2015 Paris Terror Attacks Fast Facts*, CNN, Nov. 30, 2016, http://edition.cnn.com/2015/12/08/europe/2015-paris-terror-attacks-fast-facts/index.html.

purchased from the Fast and Furious-linked Phoenix gun shop as part of the government's gunwalking operation.[97]

53.     The public did not learn of UCE-1's role in the attack until the U.S. government undertook a criminal prosecution of Abdul Malik Abdul Kareem, an associate of Simpson and Soofi who trained with them. In August 2016, an FBI affidavit that was filed in that case publicly revealed, for the first time, that UCE-1 had been in contact with Simpson prior to the attack[98] and had told him to "tear up Texas."[99] In February 2017, court records revealed that UCE-1 was present during the attack and took the photo of the Plaintiff and Officer Stevens mere seconds before they came under fire.[100] Even after the venerable CBS Sunday show *60 Minutes* confronted the agency about

---

[97] *Law Enforcement Sources: Gun Used In Paris Terrorist Attacks Came From Phoenix*, FOX NEWS, June 30, 2016, http://nation.foxnews.com/2016/06/30/law-enforcement-sources-gun-used-paris-terrorist-attacks-came-phoenix. It is also worth noting that Interpol authorities linked <u>another</u> gun used in the Paris attack to Century International Arms, a well-connected Florida arms dealer that worked with the federal government as part of the Iran-Contra scandal, and which manufactured up to 80 percent of the guns involved in the Fast & Furious operation. Pat Beall, *Dealer: Gun linked to Paris attack came through Delray firm*, PALM BEACH POST, Dec. 10, 2015, http://www.mypalmbeachpost.com/news/crime--law/dealer-gun-linked-paris-attack-came-through-delray-firm/zUfiUht53F8DwfCit1Y90K/ ; *WASRs Recovered in Latest Arizona Bust*, FRONTLINE PBS, Feb. 2, 2011, http://www.pbs.org/wgbh/pages/frontline/gunrunners-mexico/updates/2011/02/more-wasrs-recovered-in-latest-arizona-bust.html (stating that 80 percent of the guns identified by *Frontline* as being recovered through Operation Fast & Furious were "either imported or manufactured by Century"). The U.S. Justice Department moved to quash the story, claiming that the traced gun was not used in Paris, but was actually in the possession of authorities in Mexico in relation to a crime that occurred there. John Pacenti, *Delray arms manufacturer's gun not used in Paris attack*, PALM BEACH POST, Dec. 18, 2015, http://www.mypalmbeachpost.com/news/delray-arms-manufacturer-gun-not-used-paris-attack/ECGCEn3cn1QDoKUxrOcJoI/. European authorities refused to comment on their serial-number investigation, with Interpol saying it was simply an "clearinghouse for information" and that "it would defer" to the U.S. government's account. *Correction: Serbia-Paris-Guns story*, ASSOCIATED PRESS, Dec. 18, 2015, https://apnews.com/7e2ed2eb74e1414084eb49c66a637366/apnewsbreak-dealer-gun-linked-paris-attack-came-thru-us.

[98] Hare Aff. at ¶ 63.

[99] *Id*. at ¶ 67.

[100] Jacques Billeaud, *Records: Undercover FBI agent was at Garland, Texas, attack*, ASSOCIATED PRESS, Feb. 10, 2017, *available at* http://www.azcentral.com/story/news/local/phoenix/2017/02/10/records-undercover-fbi-agent-near-garland-terror-attack/97740354/.

these revelations, the FBI continued to assert that "[t]here was no advance knowledge of a plot to attack the cartoon drawing contest in Garland, Texas."[101]

**Respondeat Superior / Vicarious Liability / Civil Conspiracy / Aiding and Abetting**

54.     At all relevant times, UCE-1 was acting within the course and scope of his employment and was acting as an "investigative or law enforcement officer," as defined by 28 U. S. C. §2680(h). Plaintiff's intentional tort claims arise from the "acts or omissions" of UCE-1 as an "investigative or law enforcement officer."

**55.**     Plaintiff pleads the doctrines of conspiracy, aiding and abetting, and concert in action, all in the alternative. More specifically, the United States, (acting by and through its agents/employees/ officers) and other third parties, including Soofi and Simpson, acted together to carry out the improper and illegal actions, constituting civil conspiracy in carrying out their wrongful activities. As a law enforcement agent, the United States owed a duty to Plaintiff to not assist and encourage a terrorist attack.

56.     The United States is liable under the doctrine of aiding and abetting because it assisted and encouraged Soofi and Simpson in the commission of the assault on Plaintiff. The United States had knowledge that Soofi and Simpson committed the tort. The United States had the intent to assist the tort's commission. Defendant gave assistance and encouragement in the commission of the tort, and that assistance and encouragement was a substantial factor in causing the tort. Defendant's conduct in assisting and encouraging the attack, breached a duty owed to Plaintiff.

57.     The United States is liable under the doctrine of aiding and abetting because it assisted and participated in the commission of the assault on Plaintiff. Specifically, Soofi and Simpson

---

[101] Cooper, *supra* note 72.

assaulted Plaintiff.  The United States provided substantial assistance and encouragement in the commission of the tort, and that assistance and encouragement was a substantial factor in causing the tort.  Finally, Defendant's conduct in assisting and encouraging the attack, breached a duty owed to Plaintiff.

58.     The United States is liable under the doctrine of concert of action because it joined in the commission of the assault on Plaintiff.  The United States and Soofi and Simpson committed an assault and were grossly negligent.  This tort was highly dangerous, deviant and likely to cause serious injury and certain harm to a large number of people.  The United States agreed, tacitly and explicitly, to cooperate in the attack or participate in the attack. The United States conduct was tortious. And this tortious conduct was a substantial factor in causing Plaintiff's injury.

## Conditions Precedent & Inapplicability of Affirmative Defenses

59.     All conditions precedent to Plaintiff's right to recover have been performed or have occurred.

60.     To the extent necessary, Plaintiffs rely on and plead the discovery rule to any statute of limitations defense asserted by Defendant, including fraudulent concealment.

## V. CAUSES OF ACTION

61.     The Plaintiff alleges four causes of action: (1) assault and (2) international terrorism, and, as alternative causes of action, (3) negligence and (4) intentional infliction of emotional distress.

## FIRST CAUSE OF ACTION – ASSAULT

62.     The Plaintiff suffered physical injury and mental anguish as a result of an assault committed by an agent or agents of the United States. Though the federal government is generally

immune from lawsuits under the doctrine of sovereign immunity, the Federal Tort Claims Act ("FTCA") permits citizens to pursue certain tort claims against the federal government.[102] The FTCA allows citizens to sue for injuries that occur "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[103]

63.     The FTCA exempts a number of intentional torts, but does not exempt assaults committed by "investigative or law enforcement officers."[104] An "investigative or law enforcement officer" is defined as an officer "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law,"[105] and the exception applies to any "law enforcement officers' acts or omissions that arise within the scope of their employment, regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest."[106] As an FBI agent, UCE-1 had the power to execute searches, seize evidence, and make arrests for violations of federal law.[107]

64.     In Texas, the elements for a tort claim of assault are the same as for the crime of assault,[108] and a defendant is "criminally responsible for an offense committed by the conduct of another if:

---

[102] 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.").

[103] 28 U.S.C. § 1346(b) (2010).

[104] 28 U.S. Code § 2680 (h) ("[W]ith regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions [. . .] shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, [or] battery [...].").

[105] *Id*.

[106] Millbrook v. United States, 133 S. Ct. 1441, 1442 (2013).

[107] 18 U.S. Code § 3107; 18 U.S.C. § 3052.

[108] Johnson v. Davis, 178 S.W.3d 230, 240 (Tex.App.-Houston [14th Dist.] 2005, pet. denied).

- acting with intent to promote or assist the commission of the offense, he <u>solicits, encourages, directs, aids, or attempts to aid</u> the other person to commit the offense; or

- having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he <u>fails to make a reasonable effort to prevent commission of the offense</u>.[109]

65.     Under these standards, the United States is liable for the assault on the Plaintiff. The Defendant's agent, UCE-1, "solicit[ed], encourage[d], [and/or] direct[ed]" Simpson to commit assault against those at the Garland event when he told Simpson to "tear up Texas." UCE-1 also "aid[ed] or attempt[ed] to aid" in the attack by accompanying Simpson and Soofi to the event.

66.     In addition, the FBI "aided" Simpson and Soofi by removing the block on Soofi's irregular purchase of a gun after Soofi had begun living with Simpson, a terrorist that the agency had been closely monitoring for years. Even aside from Soofi's false statements on the background check form and prior convictions, the fact that he was living with a convicted international terrorist who was the center of a major FBI investigation would have certainly raised suspicions of a straw-man purchase. The fact that the agency was participating in a gunwalking scheme at the time strongly suggests that the FBI was "aiding" Simpson and Soofi by proactively lifting the temporary hold and allowing the transaction to go forward quickly.

67.     Furthermore, UCE-1 had "a legal duty to prevent commission of the offense," yet he acted "with intent to promote or assist its commission" by assisting with the recruitment of Simpson, encouraging Simpson to commit the attack, and accompanying Simpson and Soofi to the event, and then "fail[ed] to make a reasonable effort to prevent commission of the offense." UCE-1 made

---

[109] Tex. Penal Code Ann. § 7.02(2)-(3) (emphasis added).

no effort whatsoever to prevent the attack, and the FBI as a whole failed to make a "reasonable effort" to stop the plot before blood was shed. The routine listserve email that the FBI sent right as the event was starting falls far short of a "reasonable effort" to prevent a potential mass murder.

68.     Plaintiff suffered physical injuries as a result of the tortious actions of the United States. The Plaintiff was shot in the left leg "just above the bootline,"[110] where the bullet "brushed his bone."[111]

69.     In addition to physical damages, Plaintiff has suffered immense emotional distress and severe mental anguish as the result of the attack, which, according to research, is to be expected of a victim of terrorism. Federal courts have recognized that "[t]errorism [is] unique among the types of tortuous activities in both its extreme methods and aims," and that "[a]ll acts of terrorism are by the very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror."[112] Research conducted by the US National Academy of Sciences' Institute of Medicine after the September 11, 2001 attacks found that "[t]errorism carries with it a potentially greater impact than other disasters on distress responses, behavioral change, and psychiatric illness by virtue of the unique characteristics of terrorism events."[113]

70.     Due to the United States' actions in relation to the attack, the psychological consequences for the Plaintiff have been more severe than they would have been if the government had been blameless. Mental health researchers have found that "political attitudes (such as patriotism and

---

[110] Fernanda Santos, *Trial Starts in Attack at Exhibit of Anti-Islam Cartoons*, N.Y. TIMES, Feb. 17, 2016, http://www.nytimes.com/2016/02/18/us/trial-starts-in-attack-at-exhibit-of-anti-islam-cartoons.html.

[111] Miles, *supra* note 46.

[112] Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).

[113] INSTITUTE OF MEDICINE, PREPARING FOR THE PSYCHOLOGICAL CONSEQUENCES OF TERRORISM: A PUBLIC HEALTH STRATEGY 45 (2003).

trust in governmental institutes) […] serve as coping mechanisms at the individual level"[114] for victims of terrorism. Patriotism and trust in governmental institutions are particularly important sources of support for uniformed victims of terrorism, such as the Plaintiff.[115] Unfortunately, these coping mechanisms ae not available to the Plaintiff, as his trust in the government has been severely shaken by the possibility that the United States government was complicit in the attack.

71.     Another important mechanism for coping with a traumatic event is the interpretation and attribution of meaning to the event. Research shows that "individuals have a compelling need to understand their experience," and "the extent to which victims still searched for meaning from their victimization was positively related to their current psychological distress and behavioral maladjustment."[116] The United States, however, has obstructed the Plaintiff's attempts to "understand his experience" and "attribute meaning" to the attack. Former FBI Director Comey repeatedly gave false information regarding the attack, and the agency has stonewalled the Plaintiff's requests for more information about how and why the agency failed to prevent the attack. The Plaintiff at first suspected that the injury was the result of incompetence on the part of the FBI, but after the United States consistently rebuffed his efforts to learn more about the attack, he became convinced that there is a far more disturbing explanation: the government deliberately intended for the attack to happen. Whether or not this interpretation is ultimately validated, the

---

[114] DAPHNA CANETTI ET AL., WHAT DOES NATIONAL RESILIENCE MEAN IN A DEMOCRACY? EVIDENCE FROM THE UNITED STATES AND ISRAEL 5 (2013). *See also, e.g.,* Abbas Ebadi et al., *Spirituality: A key factor in coping among Iranians chronically affected by mustard gas in the disaster of war*, 11 NURSING & HEALTH SCI. 344 (2009) (finding that patriotism, along with spirituality, was a "key factor" in victims "accepting and coping with their chronic illness complications" from a mustard gas attack).

[115] ROBERT MORRIS TALBOT, COLLECTIVE TRAUMA AND ITS IMPACT ON PRIVATE GRIEF: THE VOICES OF LOVED ONES OF 9/11 VICTIMS 181 (2011) (stating that interviewed victims of the 9/11 terror attack who felt supported by displays of patriotism "were either formerly in uniform through the military or had loved ones who had been in uniform as a firefighter").

[116] Dean G. Kilpatrickt & Randy K. Otto, *Constitutionally Guaranteed Participation in Criminal Proceedings for Victims: Potential Effects on Psychological Functioning*, 34 WAYNE L. REV. 7 (1987).

lack of forthcomingness by the United States has caused significant mental anguish for the Plaintiff, as it has interfered with his ability to attribute a conclusive "meaning" to the event and obtain closure.

72.     The medical literature states that "[t]errorist attacks, and the threat of a terrorism event, may also result in more severe psychological consequences than other types of traumatic events due to a perceived lack of control."[117] Typically, after a terror attack, citizens can take comfort in the notion that the government will take action to bring the threat of future violence under control. But due to the FBI's actions, the Plaintiff not only fears that the government cannot be counted on to stop known terror plots, but also that the government may even be <u>assisting</u> terrorists. This "perceived lack of control" over terror threats has predictably had "severe psychological consequences" for the Plaintiff.

73.      "If effective coping strategies are not available after an exceptionally stressful life event," such as the May 3 attack, "individuals can be expected to develop chronic stress disorders such as Post-Traumatic Stress Disorder (PTSD)." As noted in the preceding paragraphs, several of the coping mechanisms that victims of terror often rely on are unavailable to the Plaintiff.

74.     In Texas, "an award of mental anguish damages may be supported by some evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'"[118] The Plaintiff's psychological symptoms meet this standard of proof.

75.     In Texas, the fact-finder has "great discretion" regarding damages. "Once the existence of some pain, mental anguish and disfigurement has been established, there is no objective way to measure the adequacy of the amount awarded as compensation, which is generally left to the

---

[117] Instit. Of Medicine, *supra* note 24.

[118] Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex.1995).

discretion of the fact finder." The only limitation is that the amount must be "fair and reasonable compensation."[119]

76.     The requested award of $8.33 million in compensatory damages is "fair and reasonable compensation" in light of the pain and mental anguish the Plaintiff has endured, and is in line with recent awards upheld by Texas courts. For example, in a 2015 court case involving a plaintiff who aggravated a chronic back injury while lifting a large object on the job and was subsequently diagnosed with depression, the Texas Court of Appeals held that an "award of $3.4 million for future pain and mental anguish is not excessive."[120] The "mental anguish" suffered by the plaintiff in that case primarily consisted of the fact that he could not "participate for very long" in outdoor sports like waterskiing.[121] The mental anguish in that court case, which was a typical tort case involving a common workplace injury, likely did not rise to the level of mental anguish that makes terrorism "unique among the types of tortuous activities."[122]

## SECOND CAUSE OF ACTION – INTERNATIONAL TERRORISM

77.     Under the ATA, "[a]ny national of the United States injured in his or her person […] by reason of an act of international terrorism […] may sue therefor  […]  and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."[123] The Plaintiff

---

[119] Diamond Offshore Servs. Ltd. v. Williams, 510 S.W.3d 57, 80 (Tex. App. 2015), reh'g denied (Apr. 28, 2016).

[120] *Id*.

[121] *Id*. at 66.

[122] *Heiser*, 659 F. Supp. 2d at 26.

[123] 18 U.S. Code § 2333(a) (emphasis added).

has sustained injuries as a result of an act of international terrorism. Thus, the imposition of treble damages is mandatory under the ATA.[124]

78.     Under the ATA § 2331, "the term 'international terrorism' means activities that—

    (A)     involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State […];

    (B)     appear to be intended—

        (i)      to intimidate or coerce a civilian population;

        (ii)     to influence the policy of a government by intimidation or coercion; or

        (iii)    to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

    (C)     […] transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

79.     The ATA also provides that "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."[125]

80.     As discussed in ¶56-59, the Garland attack "involve[d] violent acts or acts dangerous to human life that are a violation of the criminal laws" of the state of Texas. Furthermore, the United States "knowingly" "conspire[d] with" and provided "substantial assistance" to the terrorists. The FBI, for example, armed the terrorists with a Fast and Furious gun, assisted with the recruitment of Simpson, broached the possibility of "tear[ing] up Texas," and helped reconnoiter prior to the attack.

---

[124] *See* Sokolow v. Palestine Liberation Organization, 2014 WL 4212754 (S.D.N.Y.) ("Under the ATA, a successful civil plaintiff is automatically entitled to recover treble damages.")

[125] 18 U.S. Code § 2333(d)(2).

81.     The May 3 attack "appear[s] to be intended to intimidate or coerce a civilian population"

to not exercise their First Amendment right to draw images of Muhammed,[126] "to influence the

[foreign] policy of [the United States] government by intimidation or coercion,"[127] and "to affect

the conduct of [the Dutch] government by [the] assassination" of Dutch MP Geert Wilders.[128]

82.     Though Simpson and Soofi were both American citizens, the legislative record regarding

the ATA states that "a domestic terrorist group has a sufficient international nexus if it receives

'direction or substantial support' from a foreign government or terrorist group."[129] ISIS—the

"Islamic State of Iraq and Syria"–is a "foreign terrorist group" based in, as the name states, Iraq

and Syria. Simpson "was wired into a legitimate foreign fighters network" online, and received

direction to attack the Garland event from Mohamed Abdullahi Hassan, an influential ISIS

member operating from Somalia.[130] Simpson also received "material, technical, training [...]

support"[131] from foreign terrorists, as evidenced by the fact that FBI investigators "found several

electronic documents linked to terrorism, including the Al Qaeda magazine '*Inspire*,' material

---

[126] See supra notes 40-41 (in which Simpson and his compatriots discussed an attack on Garland contest to ensure that "our beloved Muhammad [will not be] drawn").

[127] *See, e.g.*, Rita Katz, *The Power of a Tweet: Elton Simpson and the #TexasAttack*, INSITE,  May 5, 2015, http://news.siteintelgroup.com/blog/index.php/categories/jihad/entry/382-the-power-of-a-tweet-elton-simpson-and-the-texasattack (stating that "[f]ollowing the call for attack [on the Garland event], Simpson, Miski, and other IS supporters would continue discussing and condemning U.S. foreign policy in Syria, Iraq, and against Muslims"); *2nd Suspect in Texas Shooting 'Grew Frustrated With US Foreign Policy,'* TURKISH AM. NEWS, May 5, 2015 http://www.turkishamericannews.com/us-news/item/500-2nd-suspect-in-texas-shooting-grew-frustrated-with-us-foreign-policy (stating that Nadir Soofi became radicalized after he "grew frustrated with American foreign policy toward the Muslim world").

[128] See infra ¶74.

[129] Nick Harper, *FISA's Fuzzy Line between Domestic and International Terrorism*, 81 U. CHI. L. REV. 1123, 1137 (2014), *citing* Foreign Intelligence Surveillance Act of 1978 Report, HR Rep No 95-1283, Part I, 95th Cong, 2d Sess 44 (1978).

[130] Rukmini Callimachi, *Clues on Twitter Show Ties Between Texas Gunman and ISIS Network*, N.Y. TIMES, May 11, 2015,          https://www.nytimes.com/2015/05/12/us/twitter-clues-show-ties-between-isis-and-garland-texas-gunman.html.

[131] Nick Harper, *FISA's Fuzzy Line between Domestic and International Terrorism*, 81 U. CHI. L. REV. 1123, 1137 (2014).

from the Global Islamic Media Front, and a video on 'Training That Makes Killing Civilians Acceptable' that was on a flash drive" belonging to Simpson.[132] Furthermore, when specifically discussing Simpson's social media discussions with ISIS members, former FBI director Comey declared that "[t]he old distinction between inspiration and direction is no longer relevant" because ISIS is "recruiting and tasking at the same time" on social media.[133] The attack, therefore, "transcend[ed] national boundaries in terms of the means by which [it was] accomplished, […and] the locale in which their perpetrators operate[ed] or [sought] asylum."

83.     The Garland attack also "transcend[ed] national boundaries in terms of […] the persons [it] appear[s] intended to intimidate or coerce." "Geert Wilders, a prominent Dutch politician"[134] and the keynote speaker for the event, "was a likely target of the attackers."[135] Prior to the attack, Wilders, who is "perhaps the world's most prominent anti-Muslim populist,"[136] was included on the "Most-Wanted List" published in Al Qaeda's *Inspire* magazine.[137]

84.     It should also be noted that Elton Simpson was already a convicted "international terrorist" when the Garland attack took place. In 2010, Elton Simpson was convicted of "international terrorism" as defined by § 2331. During its prosecution of that case, the U.S. Justice Department

---

[132] Brahm Resnik, *FBI: Garland conspirator considered Super Bowl attack*, NBC 12 News, June 16, 2015, http://www.12news.com/news/local/valley/fbi-garland-conspirator-considered-super-bowl-attack/184235305.

[133] Williams, *supra* note 61.

[134] Adam Taylor, *Europe's far right can't decide whether to love Donald Trump or loathe him*, WASH. POST, Dec. 15, 2015, https://www.washingtonpost.com/news/worldviews/wp/2015/12/15/europes-far-right-cant-decide-whether-to-love-donald-trump-or-loathe-him/.

[135] Steven Edwards, *Dutch lawmaker aims to exhibit 'Muhammad' contest cartoons in parliament*, FOX NEWS, May 7, 2015, http://www.foxnews.com/world/2015/05/07/dutch-lawmaker-aims-to-exhibit-garland-muhammad-cartoons-in-parliament.html.

[136] Max Blumenthal, *The Sugar Mama of Anti-Muslim Hate*, NATION, June 14, 2012, https://www.thenation.com/article/sugar-mama-anti-muslim-hate/.

[137] Dashiell Bennett, *Look Who's on Al Qaeda's Most-Wanted List*, ATLANTIC, Mar. 1, 2013, https://www.theatlantic.com/international/archive/2013/03/al-qaeda-most-wanted-list/317829/.

noted that "Section 2331's definition is broad, because it is part of a broad effort to combat terrorism where that effort can be effective."[138]

85.    The ATA's treble damages mandate is applicable to the United States under the FTCA, as "the United States, if a private person, would be liable to the claimant in accordance with" the ATA's provisions.[139]

86.    The United States may cite *Vermont v. United States ex rel. Stevens* in asserting that "[t]reble damages are essentially punitive in nature,"[140] and that the United States is not subject to treble liability under §2333 because the federal government is generally immune from punitive damages under the FTCA.[141] But after *Stevens* was decided, the U.S. Supreme Court retreated from its broad characterization of treble damages as punitive. In *Cook County v. United States ex rel. Chandler*, the Court held that sovereign immunity against punitive damages does not apply to treble damages statutes.[142]

87.    First, the *Chandler* Court noted that the legislation in question, the False Claims Act ("FCA"), "has no separate provision for prejudgment interest, which is usually thought essential to compensation, and might well be substantial given the FCA's long statute of limitations."[143] The Court pointed to the long statute of limitations and the lack of a specific prejudgment interest clause as support for finding that the FCA's treble damages provision "has compensatory traits" and could not be characterized solely as punitive. Like the FCA, the ATA has a ten-year statute of

---

[138] United States v. Elton Simpson, Gov't's Supp. Trial Mem. CR-10-055-PHX-MHM, at 1 (Nov. 5, 2010).

[139] 28 U.S.C. § 1346(b)(1).

[140] Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 784 (2000) (citations omitted).

[141] 28 U.S.C. § 2674.

[142] 538 U.S. 119 (2003).

[143] *Id*. at 131 (citations omitted).

limitations (in fact, the statute of limitations for an ATA claim is even more generous than for an FCA claim in that it has no qualifications regarding the date when the material facts become known),[144] and has no separate provision for prejudgment interest.[145]

88.     The *Chandler* Court also found that the FCA's treble damages were not necessarily punitive because they were intended to "enhance[] the incentives […] to bring suit."[146] The ATA's treble damages provision, like the FCA's, was designed to increase the incentives for bringing suit against supporters of terrorism. The general "intended effect" of the ATA was to "support[] civil claims" related to terrorism,[147] and the ATA's treble damages provision was intended to "encourage the appropriate use of our legal system by allowing plaintiffs to recover three times their actual damages, along with attorney fees."[148] Civil lawsuits play a crucial role in exposing government misdeeds that the United States would have little interest in investigating itself, so it is in the public's interest to encourage such suits through the treble damages incentive. The need for treble damages is particularly important for incentivizing lawsuits like this one. When government-involved terrorist attacks do not result in civilian deaths, actual damages and media

---

[144] *Compare* 31 U.S.C. § 3731(b) (stating that an FCA claim may be brought "[no] more than 6 years after the date on which the violation […] is committed, or more than 3 years after the date when facts material to the right of action are known […], but in no event more than 10 years after the date on which the violation is committed") *with* 18 U.S. Code § 2335 ("[A] suit for recovery of damages under section 2333 of this title shall not be maintained unless commenced within 10 years after the date the cause of action accrued.").

[145] 18 U.S. Code § 2333 (specifically listing only "threefold the damages he or she sustains and the cost of the suit, including attorney's fees" as the remedies available to a victim of international terrorism).

[146] *Chandler*, 538 U.S. at 133.

[147] Brief of United States Senators Charles E. Grassley et al., Sokolow v. Palestine Liberation Organization, 2017 WL 1291691, 1 (U.S.) (emphasis added). Public policy encourages private lawsuits against terrorists because, "[u]nlike criminal prosecutions, which are expensive for the government and take a long time, civil cases funded by private plaintiffs offer the government a relatively inexpensive and effective way to combat the financing of terrorists." Jack D. Smith & Gregory J. Cooper, *Disrupting Terrorist Financing with Civil Litigation*, 41 CASE W. RES. J. INT'L L. 65, 72 (2009).

[148] ANTITERRORISM ACT OF 1991: HEARING BEFORE THE SUBCOMMITTEE ON INTELLECTUAL PROPERTY AND JUDICIAL ADMINISTRATION OF THE COMMITTEE ON THE JUDICIARY 15 (1993) (emphasis added).

interest are both likely to be lower than when civilian deaths are involved. In these less-sensational terrorist attacks that tend to be overlooked by our informal government "ombudsman" (the media), treble damages help ensure that plaintiffs file tort lawsuits and litigative investigations into potential government wrongdoing are pursued.

89.    Finally, the *Chandler* Court noted "treble damages certainly does not equate with classic punitive damages, which leaves the jury with open-ended discretion over the amount" and carries a risk that "the government's taxing power will make it an easy target for an unduly generous jury."[149] Under the FCA's treble damages statute, the Court continued, "the jury is open to no such temptation; if it finds liability, its instruction is to return a verdict for actual damages, for which the court alone then determines any multiplier."[150] The risk of the "government's taxing power" being targeted is even lower in an ATA suit, as the imposition of treble damages is automatic[151] and nothing is left to the discretion of a court.[152]

## THIRD (ALTERNATIVE) CAUSE OF ACTION – NEGLIGENCE

90.    As an alternative to the prior causes of action, Plaintiff alleges this third cause of action sounding in negligence. As discussed previously, the FTCA permits citizens to pursue tort claims against the federal government when the government's actions would constitute a tort under the law of the state where the act occurred.[153] In Texas, when law enforcement operations pose an

---

[149] *Chandler*, 538 U.S. at 132.

[150] *Id*.

[151] *See* Boim v. Holy Land Found. for Relief and Dev., 549 F.3d 685, 692 (7th Cir.2008) ("[S]ection 2333 provides for an automatic trebling of damages.").

[152] *See* False Claims Amendments Act of 1986, Pub. L. 99-562, § 2(7), 100 Stat. 3153, 3153-54 (granting the court fact-finding discretion in determining whether double or treble damages are appropriate in an FCA suit).

[153] *See supra* text at ¶55.

unreasonable risk of injury, those injured as a result of this negligence may recover against the government.

91.     In determining whether it was negligent for government agents to continue with a potentially-dangerous law enforcement operation, Texas courts apply the "*Chambers* balancing test,"[154] weighing factors such as:

     a.     the "seriousness of the crime" that the operation seeks to interrupt;

     b.     whether the continuance of the operation "is necessary to prevent injury or loss of life or to apprehend a suspect";

     c.     whether "alternative courses of action, if any, are available to achieve a comparable result";

     d.     "the nature and severity of harm that the officer's actions could cause";

     e.     "the likelihood that any harm would occur"; and

     f.     "whether any risk of harm would be clear to a reasonably prudent officer."[155]

92.     Even if this court were to find that the FBI and its agents did not "intent to promote or assist the commission" of the terror attack, but were rather acting to preserve UCE-1's cover during an ongoing undercover operation, the court should still hold that the FBI failed to act reasonably when it refused to alert local law enforcement that Simpson and Soofi posed an imminent threat. Even though such an alert might have risked blowing UCE-1's cover, no "reasonably prudent" law enforcement agency would consider that undercover operation to be worth leaving officers at the

---

[154] Wadewitz v. Montgomery, 951 S.W.2d 464, 467 (Tex. 1997), *citing* City of Lancaster v. Chambers, 883 S.W.2d 650, 656-57 (Tex. 1994).

[155] *Id.*

Curtis Culwell Center unprepared for Simpson and Soofi's arrival. Applying the *Chambers* balancing test factors:

a.  though "seriousness of the crime" of terrorism is certainly significant, the FBI already had more than enough evidence to lock away Simpson, Soofi, and their associates for a long time, even if the uncover operation had been terminated prior to the Plaintiff's injury[156];

b.  though the FBI may claim that the continuance of UCE-1's undercover operation was "necessary to prevent injury or loss of life or to apprehend a suspect" in regard to other possible plots, these speculative possibilities do not justify the failure to prevent a near-certain and imminent injury or loss of life;

c.  "alternative courses of action" to UCE-1's ongoing undercover operation were likely available "to achieve a comparable result" (i.e., arresting Simpson and Soofi's terror associates and breaking up other plots);

d.  "the nature and severity of harm that the [FBI's] actions could cause" was extreme, as many could have been injured and killed during the attack;

e.  once the FBI's undercover operation reached the Curtis Culwell Center, "the likelihood that any harm would occur" become virtually certain: at the very least, Simpson and Soofi (who, though evil individuals, were still American citizens who could have been saved from their suicidal mission

---

[156] *See, e.g.*, Tom Steele, *Man who helped plot Garland terrorist attack gets 30 years in prison*, DALLAS MORNING NEWS, Feb. 8, 2017, https://www.dallasnews.com/news/crime/2017/02/08/man-helped-plot-garland-terrorist-attack-gets-30-years-prison.

if the FBI had moved to arrest them when they were unarmed) would be

killed, and others were put at grave risk of harm as well; and

    f.    this "risk of harm would be clear to a reasonably prudent officer."

93.    The Plaintiff reasserts the damages described in ¶61-69, and alleges that they resulted from the negligent acts of the FBI during its undercover investigation.

## FOURTH (ALTERNATIVE) CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94.    As an alternative to the prior causes of action, Plaintiff alleges intentional infliction of emotional distress as a fourth cause of action. As discussed previously, the FTCA permits citizens to pursue tort claims against the federal government when the government's actions would constitute a tort under the law of the state where the actions occurred.[157] In Texas, when a defendant intentionally or recklessly engages in extreme and outrageous conduct that causes severe emotional distress, the victim may recover damages against the defendant for that emotional distress.[158]

95.    The FBI's actions over the course of the Simpson investigation were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[159] The FBI spent millions of taxpayer dollars on tracking Simpson for nearly a decade, lifted a background check hold to allow Soofi to obtain a gun, reached out to Simpson on Twitter and incited him to "tear up Texas," and even had an agent "in Middle Eastern attire" reconnoitering on behalf of the terrorists and

---

[157] *See supra* text at ¶55.

[158] Hoffmann-La Roche Inc. v. Zeltwanger, 144 S.W.3d 438, 445 (Tex. 2004).

[159] Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex.1993) (quoting Restatement (Second) of Torts § 46 cmt 46 cmt. d (1965)).

possibly directing them to undermanned vehicle entrance where the attack took place. The fact that FBI Director gave so many demonstrably-false statements during the post-attack cover-up shows that he recognized that the agency's actions were beyond the "bounds of decency," "atrocious," and "utterly intolerable in a civilized community."

96.    The Plaintiff reasserts the damages described in ¶61-69, and alleges that this severe emotional distress was caused by the FBI's extreme and outrageous conduct.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for a judgment against Defendant for:

1. $8.33 million in compensatory damages;

2. Treble damages;

3. Any other relief as the court deems appropriate.

Dated: 10/02/2017

Trenton Roberts
ROBERTS & WILLIE, PLLC
Attorney for Plaintiff
MR. BRUCE JOINER