# United States District Court
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BRUCE JOINER | § § § | |
| v. | § § | CASE NO. 3:17-CV-2692-S |
| UNITED STATES OF AMERICA | § § § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant United States of America's ("Defendant") Motion to Dismiss [ECF No. 8]. For the following reasons, the Court grants the Motion.

### I.  BACKGROUND

Pursuant to Special Order 3-318, this case was transferred from the docket of Chief Judge Barbara M.G. Lynn to the docket of this Court on March 8, 2018. Plaintiff Bruce Joiner ("Plaintiff") brought this lawsuit after being shot in the leg while working as a security guard at the "First Annual Muhammed Art Exhibit and Contest," an event that took place at the Curtis Culwell Center in Garland, Texas, on May 3, 2015. Compl. ¶¶ 1, 7, 40.

In the mid-2000s, the FBI began investigating Hassan Abu-Jihaad, whom they suspected was involved in terrorism-related activities. *Id.* ¶ 8. While Abu-Jihaad was under surveillance, the FBI noticed that he was "socializ[ing] a lot" with Elton Simpson, a fellow member of the Islamic Community Center of Phoenix ("ICCP"). *Id.* ¶ 11. In March 2007, the FBI arrested Abu-Jihaad. *Id.* ¶ 12. It then continued its investigation with Simpson as the main focus. *Id.*

The FBI recruited an informant to befriend Simpson. *Id.* ¶ 13. The informant recorded conversations with Simpson and provided information to the FBI. *Id.* ¶ 14. During the course of

these recorded conversations, Simpson stated that he was interested in joining Al-Shabaab, a terrorist organization, and provided the informant with details on how he planned to do so. *Id.* ¶ 15. The FBI ultimately arrested Simpson for lying to a federal agent, a crime for which Simpson served three years' probation. *Id.* ¶ 16. After his arrest, Simpson befriended Nadir Soofi. *Id.* ¶ 17. Soofi gave Simpson a job, and Simpson moved into Soofi's apartment. *Id.* ¶ 18.

Around the time Soofi met Simpson, Soofi attempted to purchase a handgun from a gun dealership in Arizona. *Id.* ¶ 19. Authorities allegedly initially placed a seven-day hold on the transaction, but the hold was lifted after 24 hours. *Id.* When the hold was lifted, Soofi purchased a 9-millimeter pistol. *Id.* For the next five years, Simpson and Soofi continued to live together. *Id.* ¶ 20. Another ICCP member, Abdul Malik Abdul Kareem, moved in with them as well. *Id.* The FBI investigated the trio in 2012 and found "several electronic documents linked to terrorism." *Id.*

On January 7, 2015, terrorists killed 12 people at the office of *Charlie Hebdo*, a French satirical magazine, in retaliation for the magazine's cartoon depictions of the prophet Muhammad. *Id.* ¶ 21. On January 17, 2015, an Islamic group held a conference titled "Stand with the Prophet in Honor and Respect," at which opposition to cartoon depictions of Muhammad was a central focus. *Id.* The conference was held at the Curtis Culwell Center in Garland. *Id.* Pamela Geller, a free speech activist, organized a protest outside of the conference. *Id.* ¶ 22. Then, Geller announced that she would host a "Draw the Prophet" competition at the Curtis Culwell Center in May 2015. *Id.* Geller's conference generated press coverage, and Garland Independent School District, the owner of the venue, charged Geller's group $10,000 so that it could hire 40 extra officers to work the event. *Id.* ¶ 23.

Meanwhile, in March 2015, a South Carolina resident named Eric Jamal Hendricks allegedly began taking steps to form an ISIS cell within the United States. *Id.* ¶ 24. He used social media to recruit new members. *Id.* On March 24, 2015, an undercover FBI agent ("UCE-1") contacted Hendricks on social media, posing as a person who was interested in joining the ISIS cell. *Id.* ¶ 24. After a vetting process, Hendricks determined that UCE-1 was qualified to move to the "next level." *Id.* ¶ 25. Hendricks told UCE-1 that he was affiliated with ISIS and asked for UCE-1's help in recruiting new members. *Id.*

On April 23, 2015, Simpson discussed the upcoming Garland event in a series of tweets with Mohamed Abdullahi Hassan, an ISIS member operating in Somalia. *Id.* ¶ 26. Hendricks noticed Simpson's tweets and reached out to Simpson to ask for his contact information. *Id.* ¶ 27. Simpson accused Hendricks of being a spy, and Hendricks instructed UCE-1 to validate Hendricks's identity. *Id.* UCE-1 contacted Simpson, and they ultimately began cryptically discussing the possibility of "organizing." *Id.* ¶ 28.

On April 24, 2015, UCE-1 and Simpson were chatting over social media. *Id.* ¶ 29. Simpson shared a link about Geller's upcoming event, and the conversation proceeded as follows:

| | |
|---|---|
| UCE-1: | Tear up Texas. |
| Simpson: | Bro, u don't have to say that. . . U know what happened in Paris. . . I think. . . Yes or no. . .? |
| UCE-1: | Right. |
| Simpson: | So that goes without saying. . . No need to be direct. |

*Id.* ¶ 30.

The week before Geller's event, Simpson's name appeared in a routine terrorism bulletin that was sent to law enforcement agencies around the country. *Id.* ¶ 32. On May 1, 2015,

Hendricks talked to UCE-1 about the upcoming event. *Id.* ¶ 33. UCE-1 reminded Hendricks that Simpson was interested in the event. *Id.* They talked again the next day, and UCE-1 volunteered to go to the event because Hendricks could not attend. *Id.* ¶ 34. Hendricks told UCE-1 to "[s]ee what you and bro [Simpson] can do" and added that Simpson "has another brother he knows." *Id.* Hendricks then gave Simpson's alternate Twitter contact information to UCE-1. *Id.*

The day of the event, May 3, 2015, UCE-1 allegedly traveled to Garland to meet up with Simpson. *Id.* ¶ 35. According to Plaintiff, Simpson, Soofi, and UCE-1 traveled together to the Curtis Culwell Center in two separate cars. *Id.* Simpson and Soofi were in the lead car, and UCE-1 was following behind them. *Id.* Simpson and Soofi were wearing body armor and were equipped with three assault rifles, three handguns, and 1,500 rounds of ammunition. *Id.*

At approximately 4:00 p.m., the FBI sent out an email bulletin containing a list of suspected extremists who were interested in the event. *Id.* ¶ 36. Included in the bulletin were information about Simpson's general interest in the event, a photograph of Simpson, and a possible vehicle license plate. *Id.* The Garland Police Department received the email but reported that no one saw it until after the attack had taken place. *Id.*

After the event started, UCE-1 messaged Hendricks and told him that he was "in the vicinity." *Id.* ¶ 37. Hendricks asked UCE-1 about the crowd, building, security, and media presence. *Id.* Hendricks instructed UCE-1 to wait until the attendees were outside to attack. *Id.* UCE-1, Simpson, and Soofi then approached the entrance to the rear parking lot. *Id.* ¶ 38. Garland Police Officer Gregory Stevens and Plaintiff were guarding the barricade at that entrance. *Id.* Plaintiff was unarmed and was responsible for checking the identification of those entering the event. *Id.*

4

Simpson pulled up to the police barricade and stopped. *Id.* ¶ 39. As Plaintiff walked up to the vehicle to check the passengers' identification, Simpson and Soofi jumped out of the vehicle and opened fire on Stevens and Plaintiff. *Id.* Plaintiff was shot in the leg. *Id.* ¶ 40. Stevens mortally wounded Simpson and Soofi, and a member of the SWAT team fatally shot them. *Id.* UCE-1 attempted to flee but was stopped by the Garland police, at which point he informed them that he was an FBI agent. *Id.* ¶ 41.

On May 5, 2015, ISIS claimed responsibility for the Garland attack. *Id.* ¶ 44. That same day, Hendricks reached out to UCE-1 via social media to discuss the attacks. *Id.* ¶ 46. Over the next week, the two men allegedly continued to communicate online. *Id.* ¶ 47.

For the above actions, Plaintiff brought suit against the United States pursuant to the Federal Tort Claims Act ("FTCA") and the Anti-Terrorism Act ("ATA"). He hinges his theories of the United States' liability on the doctrines of respondeat superior, vicarious liability, civil conspiracy, and aiding and abetting. Plaintiff brought causes of action for assault, international terrorism, negligence, and intentional infliction of emotional distress. The latter two claims are in the alternative. The United States moved to dismiss the action for lack of subject-matter jurisdiction or, in the alternative, for failure to state a claim.

## II. THE RULE 12(b)(1) STANDARD

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). Dismissal for lack of subject-matter jurisdiction is warranted when "it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Gilbert v. Donahoe*, 751 F.3d 303, 307 (5th Cir. 2014) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). "Lack of subject matter jurisdiction may be

found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161. When a defendant mounts a facial attack to the pleadings, courts look to the sufficiency of the allegations in the complaint, which are presumed to be true. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). When a defendant mounts a factual attack, by contrast, the defendant submits affidavits, testimony, or other evidentiary materials. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). The presumption of truthfulness does not attach to plaintiff's allegations, "and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.*

### III. ANALYSIS

#### A. *Subject-Matter Jurisdiction – FTCA*

The United States is immune from suit absent its consent, and the terms of that consent define a court's jurisdiction over claims brought against the United States. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980). Absent a specific waiver, sovereign immunity prevents a court from exercising subject-matter jurisdiction over a case. *See FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994). The FTCA contains a limited waiver of sovereign immunity. 28 U.S.C. § 1346(b)(1). Courts "strictly construe such waivers, resolving all ambiguities in favor of the sovereign." *Patel v. United States*, 398 F. App'x 22, 27 (5th Cir. 2010). The FTCA's waiver is subject to several exceptions, which are set forth in 28 U.S.C. § 2680. One such exception is the discretionary function exception, which bars "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an

employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

Courts use a two-part test to determine whether the discretionary function exception bars a particular claim. First, the court asks whether the act "involv[es] an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). In answering this question, courts look to whether a "federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." *Id.* If it does, "the employee has no rightful option but to adhere to the directive," and there is no element of judgment or choice. *Id.* Second, the court must determine whether the "judgment is of the kind that the discretionary function was designed to shield." *Id.* at 322-23. The exception only protects "actions and decisions based on considerations of public policy." *Id.* at 323 (quoting *Berkovitz*, 486 U.S. at 537). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325; *see also Spotts v. United States*, 613 F.3d 559, 572 (5th Cir. 2010) (noting that proper inquiry is not whether agent "*in fact* engaged in a policy analysis when reaching his decision but instead whether his decision was 'susceptible to policy analysis'" (quoting *Gaubert*, 499 U.S. at 325)).

"To state a claim under the FTCA, a plaintiff has the burden of stating a claim for state-law tort and establishing that the discretionary function exception does not apply." *Spotts*, 613 F.3d at 569 (citing *St. Tammany Par. ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 n.3 (5th Cir. 2009)). If the plaintiff fails to carry this burden, the court lacks subject-matter jurisdiction. *See Buchanan v. United States*, 915 F.2d 969, 970 (5th Cir. 1990).

i. *Whether the Act Involves an Element of Judgment or Choice*

a. *The Undercover Operation*

Plaintiff takes issue with several of UCE-1's and the FBI's actions and decisions, including UCE-1's "tear up Texas" comment, texts to Hendricks reassuring him that UCE-1 was armed, and photographing of Plaintiff before the shooting. All of these decisions are related and were undertaken pursuant to UCE-1's undercover investigation, so the Court will consider them together. Plaintiff argues that two FBI policies—the Attorney General's Guidelines on FBI Undercover Operations[1] ("Undercover Guidelines") and the FBI Domestic Investigations and Operations Guide[2] ("DIOG")—specifically provide courses of action that the FBI failed to follow. The Court disagrees for two reasons. First, both policies identified by Plaintiff involve at least an element of judgment or choice. Second, Plaintiff ignores a third policy, the National Security Undercover Operations Policy Guide ("NSUCOPG"), that "specifically applies to the operational conduct of FBI undercover activity in the context of a national security investigation." Def.'s App. 41.

As Matthew J. Desarno's[3] Declaration notes, "FBI policies allow investigative personnel wide discretion to determine the operational details of how to conduct an investigation." Def.'s App. 40. Plaintiff contends, however, that UCE-1 exceeded his discretionary authority by participating in Simpson's and Soofi's violent acts, including inciting Simpson by sending the

---

[1] UNDERCOVER & SENSITIVE OPERATIONS UNIT, ATTORNEY GENERAL'S GUIDELINES ON FBI UNDERCOVER OPERATIONS (1992), https://www.justice.gov/archives/ag/undercover-and-sensitive-operations-unit-attorney-generals-guidelines-fbi-undercover-operations#preparation [hereinafter UNDERCOVER GUIDELINES].
[2] FBI DOMESTIC INVESTIGATIONS AND OPERATIONS GUIDE § 17 (2013), https://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20(DIOG)/fbi-domestic-investigations-and-operations-guide-diog-2013-version/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20(DIOG)%202013%20Version%20Part%2001%20of%2001/view [hereinafter DIOG].
[3] Desarno was, at the time of the Declaration's filing, the Acting Assistant Director, Counterterrorism Division of the FBI.

8

"tear up Texas" message, reassuring Hendricks that he was armed at the event, accompanying Soofi and Simpson to the event, and conducting reconnaissance at the event. Resp. 7-8.

"The Undercover Guidelines grant the FBI broad discretion in conducting undercover operations." *Suter v. United States*, 441 F.3d 306, 311 (4th Cir. 2006). Plaintiff specifically points to Section IV.A(2)[4] of the Undercover Guidelines, which requires that "[w]hen an undercover employee learns that persons under investigation intend to commit a violent crime, he or she shall try to discourage the violence." Resp. 7 (quoting UNDERCOVER GUIDELINES § VI.A(2)). While this section contains the mandatory term "shall," the Supreme Court has held that the discretionary function exception requires only an *element* of judgment or choice. *Gaubert*, 499 U.S. at 322; *see also Patel*, 398 F. App'x at 29 ("Despite the policy statement's mandate that certain information 'shall' be included, the directive includes an 'element' of discretion . . . ."). Here, the relevant section of the Undercover Guidelines contains multiple discretionary elements; namely, the determination of when someone intends to commit to a violent crime, what constitutes a violent crime, and how and when to "try" to discourage the violence. *Cf Gonzalez v. United States*, 814 F.3d 1022, 1029 (9th Cir. 2016) (finding FBI's decision not to disclose information involved discretion because "[t]he [Attorney General's] Guidelines provide no criteria for determining what . . . constitutes 'serious criminal activity'").

Plaintiff next points to two provisions of the DIOG that he contends mandated a certain course of action for the FBI and/or UCE-1 to follow. First, he points to section 17.1, which defines "Otherwise Illegal Activity" as "conduct . . . which constitutes a crime under local, state, or federal law if engaged in by a person acting without authorization." "Certain types of [Otherwise Illegal Activity] cannot be authorized, such as . . . participation in an act of violence." DIOG § 17.1.

---

[4] It appears that Plaintiff intended to refer to § VI.A(2), which contains the cited language.

9

Next, Plaintiff points to section 17.5(2), which states, "Participation in otherwise illegal activity that involves a significant risk of violence or physical injury requires authorization . . . ."[5] Sections 17.1 and 17.5(2) contain elements of discretion. An agent must determine what constitutes a "significant risk of violence or physical injury." Further, Plaintiff has alleged neither that UCE-1's conduct would constitute a crime, nor that UCE-1 lacked authorization even if his conduct would constitute a crime. *See* Resp. 8 ("*If* such authorization was lacking, UCE-1's actions do not fall under the discretionary function exception." (emphasis added)). Finally, as to the requirement that participation in acts of violence may not be authorized, there are elements of discretion. The relevant authority must determine what conduct amounts to "participation" and what constitutes an "act of violence."

Plaintiff contends that, even if UCE-1 and the FBI had discretionary authority, they exceeded the scope of that authority and violated agency policy. The Court disagrees. "FBI policies allow investigative personnel wide discretion to determine the operational details of how to conduct an investigation[,]" including "how to communicate and interact with subjects of investigation [and] whether and when to take overt law enforcement action." Def.'s App. 40. The Court finds that the conduct alleged by Plaintiff falls within the scope of the discretionary authority conferred on the FBI by the Undercover Guidelines and the DIOG.

In his Complaint, Plaintiff also argues that the FBI failed to alert local law enforcement to the possibility of an attack. However, he points to no governing statute, regulation, or policy. And, he does not address the issue in his Response. "The FBI's judgment about how to respond to a reported threat and how extensively to disclose information to other law enforcement

---

[5] This section comes from the 2011 version of the DIOG. The Court assumes that the 2013 version would be more relevant to conduct occurring in 2015. However, the Court will consider Plaintiff's argument, as it does not change the Court's ultimate conclusion.

10

organizations implicates many risks, all of which must be weighed in accordance with the FBI's social and public policy judgments." *Gonzales*, 814 F.3d at 1033. The governing policies identified by the United States, including Policy Directive 0012D and DIOG § 14.5, reflect this need for judgment and contain elements of discretion. *See* Def.'s App. 42-43.

Moreover, Plaintiff failed to address the NSUCOPG, which "functions as a standalone policy" and "applies to the operational conduct of FBI undercover activity in the context of a national security investigation." Def.'s App. 41; *see also* DIOG § 17.3 (carving out "[Otherwise Illegal Activity] by an FBI employee in an undercover operation . . . relating to a threat to the national security" and noting that such activity is governed by Attorney General's Guidelines for Domestic FBI Operations and the NSUCOPG). The NSUCOPG, like the Undercover Guidelines and the DIOG, "does not contain any provision directing the particular operational manner in which the undercover technique should be carried out, including how a UCE is to interact and communicate with subjects of investigation, sources of information, and other individuals" and thus leaves room for judgment. Def.'s App. 41.

For the foregoing reasons, the Court finds that the policies identified by Plaintiff, along with the NSUCOPG, contain elements of discretion and that the FBI acted within the scope of that discretionary authority. Thus, the first prong of the *Gaubert* analysis is satisfied with regard to the conduct of the undercover operation and UCE-1's actions leading up to and during the incident in Garland.

### b. *The Gun Sale*

Next, Plaintiff contests the FBI's conduct in lifting a hold on the sale of a handgun to Soofi. Plaintiff argues that the FBI had no discretion to approve the sale, as 18 U.S.C. § 922 and 28 C.F.R. § 25.6(c)(1)(iv)(C) specifically provide a course of action that the FBI failed to follow. The Court

11

disagrees. When a dealer submits a potential purchaser's information to the FBI's National Instant Criminal Background Check System ("NICS"), the NICS Operations Center provides the dealer with one of three responses. Under 18 U.S.C. § 922(d), it is unlawful to sell any firearm to certain classes of people. If the potential purchaser belongs to one of these classes, the Operations Center will issue a "Denied" response. 28 C.F.R. § 25.6(c)(1)(iv)(C). If NICS finds a record that needs more research, the Operations Center will issue a "Delayed" response. *Id.* § 25.6(c)(1)(iv)(B). The sale cannot be completed unless either the Operations Center sends a "Proceed" response or three business days expire without a response. *Id.* If NICS finds no disqualifying information, the Operations Center will issue a "Proceed" response. *Id.* § 25.6(c)(1)(iv)(A).

Plaintiff argues that three subsections of § 922(d) rendered it unlawful for the FBI to lift the hold on the sale of the handgun. Subsection (1) prohibits selling a firearm to someone who "is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." Plaintiff does not allege that Soofi was under indictment for or has been convicted of such a crime. Indeed, the article he cites to support his argument that Soofi had been charged in "about 20 court cases" belies his argument.[6] That article discusses Soofi's convictions in Utah and notes that the convictions were for Class B misdemeanors, which carry a maximum sentence of six months. Dobner, *supra* note 6; UTAH CODE ANN. § 76-3-204(2). Thus, Plaintiff does not plausibly allege that Soofi's purchase was prohibited by subsection (1). Subsection (9) prohibits selling a firearm to someone who has been convicted of a misdemeanor crime of domestic violence. Plaintiff does not allege that Soofi has been convicted of such a crime. Therefore, the Complaint provides no support for the notion that Soofi's purchase was prohibited by subsection (9).

---

[6] Jennifer Dobner, *Texas Gunman Attended U. of U. from '98 to '03*, SALT LAKE TRIB. (May 5, 2015), http://archive.sltrib.com/article.php?id=2479109&itype=CMSID.

12

Finally, subsection (3) prohibits selling a firearm to a person who is an "unlawful user of or addicted to any controlled substance." While Soofi's criminal record does contain drug-related charges, the definition of "unlawful user" contains ample room for discretion. 28 C.F.R. § 478.11 defines "unlawful user of or addicted to any controlled substance" as "[a] person who uses a controlled substance and has lost the power of self-control with reference to the use of [a] controlled substance; and any person who is a current user of a controlled substance." Under this definition, "there must be some regularity of drug use in addition to contemporaneousness [with the possession of a firearm]." *United States v. Patterson*, 431 F.3d 832, 839 (5th Cir. 2005). Determining whether a person is using drugs "regularly" or "has lost the power of self-control" requires the exercise of discretion. And, Plaintiff's allegations do not indicate that the FBI exceeded the scope of this discretion.

Finally, Plaintiff argues that, in 2004, the Department of Justice began checking prospective gun purchasers against the FBI's terrorist watchlist. Resp. 11 (citing WILLIAM J. KROUSE, CONG. RESEARCH SERV., RL330111, TERRORIST SCREENING AND BRADY BACKGROUND CHECKS FOR FIREARMS 12 (2007)). A match in the terrorist database triggers an automatic 72-hour delay in approving the sale. *Id.* at 11-12 (citing Eugene Kiely & Robert Farley, *Suspected Terrorists and Guns*, FACTCHECK.ORG (June 20, 2016), https://www.factcheck.org/2016/06/suspected-terrorists-and-guns/). Thus, Plaintiff contends, the FBI's decision to lift the hold on Soofi's purchase after only 24 hours was "highly unusual." Resp. 11. Plaintiff's argument is missing a critical component—he does not allege, either in his Complaint or in his briefing on the Motion to Dismiss, that Soofi was on the terrorist watchlist when he purchased the gun. Further, Plaintiff alleges only that the FBI "typically" uses the entire 72-hour window to investigate. Resp. 12 (citing Kiely & Farley, *supra*). Plaintiff does not allege that the policy

prohibited the FBI's lifting of the hold after 24 hours. Thus, the Department of Justice's policy is irrelevant. Even if it were relevant, there is no indication that the FBI violated the policy.

For the foregoing reasons, much of the FBI's alleged conduct in authorizing the handgun sale did not violate the relevant statute or policy. Those acts that may be covered by the statute involve an element of judgment or choice, and the FBI acted within the scope of its discretionary authority. Thus, the Court finds that the first prong of the *Gaubert* analysis is satisfied with respect to the FBI's alleged decision to lift the hold on the gun sale.

### ii. *Whether the Decision Is Susceptible to Public Policy Analysis*

"[E]ven assuming the challenged conduct involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (internal quotation marks and citation omitted). For the following reasons, the Court finds that the judgments at issue in this case were "based on considerations of public policy." *Id.* at 323 (quoting *Berkovitz*, 486 U.S. at 537).

#### a. *The Undercover Operation*

The Court finds that the FBI's decisions during UCE-1's undercover investigation are susceptible to public policy analysis and, therefore, are protected by the discretionary function exception. This case is highly analogous to *Georgia Casualty & Surety Co. v. United States*, 823 F.2d 260 (8th Cir. 1987). In that case, the Eighth Circuit first noted that "[a]n undercover operation constitutes a 'permissible means of investigation.'" *Id.* at 263 (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)). The court went on to note that, "in developing a strategy" to apprehend the targets of the undercover investigation, "the FBI had to weigh the public concern for reducing widespread criminal activity against the harm to innocent victims resulting from a covert operation." *Id.* Ultimately, the court held that the decision was susceptible to policy analysis

14

because "[t]he FBI's decision to maintain secrecy . . . involved the balancing of policy considerations protected by the discretionary function exception." *Id.*

The same logic applies here. In developing a counterterrorism strategy, the FBI presumably weighed the public concern for reducing terroristic threats against the harm to innocent victims, such as Plaintiff, resulting from the undercover operation and the actions taken pursuant to such operation. The actions of which Plaintiff complains were integral to the undercover operation because of the need to maintain UCE-1's undercover identity. *See Suter*, 441 F.3d at 311-12 ("The FBI's decision whether, as part of its investigation, to participate in criminal activity . . . 'is one which we would expect inherently to be grounded in considerations of public policy.'" (quoting *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993))). Accordingly, the Court finds that the FBI's contested decisions involved the balancing of policy considerations protected by the discretionary function exception.

"Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense." *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991). An FBI counterterrorism investigation undoubtedly involves myriad considerations of national security policies. While Plaintiff points to the "intense scrutiny of Congress" *after* the attack to argue that the FBI's actions were not the type that Congress intended to shield, Plaintiff cites to no precedent standing for the proposition that Courts should consider reactions to conduct, rather than the nature of the conduct itself. Resp. 15. In fact, the discretionary function exception shields conduct "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). At most, Plaintiff's argument could suggest that the FBI abused its discretion. It does not render the discretionary function exception inapplicable to the instant case. For this additional reason, the Court finds that the FBI's decisions during the undercover investigation are susceptible

15

to public policy analysis. Because both prongs of the *Gaubert* analysis are satisfied, the Court finds that Plaintiff has failed to carry his burden of showing that the discretionary function exception does not apply. The discretionary function exception bars Plaintiff's claims relating to the undercover operation.

### b. *The Gun Sale*

"[I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324 (citing *Dalehite v. United States*, 346 U.S. 15, 36 (1953)). Here, Plaintiff has not plausibly alleged that the FBI did not obey the directives set out in 18 U.S.C. § 922. He simply argues that the decision to lift the hold after 24 hours was "highly unusual." Resp. 11. This allegation is insufficient to show that the FBI deviated from the statutory directive. For the reasons discussed above, there was no apparent reason for the FBI to issue a "Denied" response. If, as seems likely from Plaintiff's allegations, the FBI issued a "Delayed" response, the agency could lift the hold after appropriately researching Soofi's NICS record. There is no requirement that the Operations Center utilize the entirety of the maximum 72-hour hold. Further, to the extent that there was room for discretion, the Court finds that the decision to lift the hold is susceptible to public policy analysis. Thus, the Court finds that the FBI's conduct in lifting the hold on the gun sale is protected by the discretionary function exception.

### iii. *Due Process*

Plaintiff argues that, even if Defendant has satisfied the *Gaubert* test, Defendant has committed a constitutional violation and thus cannot avail itself of the discretionary function exception. *See Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016) ("[T]he FTCA's

16

discretionary-function exception does not provide a blanket immunity against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional prescription."). But, the Fifth Circuit has not decided this issue. *See Spotts*, 613 F.3d at 569 ("[The Fifth Circuit] has not yet determined whether a constitutional violation . . . precludes the application of the discretionary function exception." (citing *Castro v. United States*, 608 F.3d 266 (5th Cir. 2010))).

Even if the Court were to assume that a constitutional violation precludes application of the discretionary function exception, Plaintiff has failed to allege a constitutional violation. Plaintiff relies on the "state-created danger" theory to argue that Defendant violated the Due Process Clause. *See, e.g., Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005) (explaining state-created danger theory). However, Plaintiff states that "the Fifth Circuit 'has consistently side-stepped the question of whether to adopt' the state-created danger theory." Resp. 13 (internal quotation omitted); *see also Dixon v. Alcorn Cty. Sch. Dist.*, 499 F. App'x 364, 366 (5th Cir. 2012) ("[T]his Court has consistently refused to adopt the state-created danger theory . . . ."). Without further guidance from the Fifth Circuit, this Court declines to adopt the theory in the instant case. Therefore, the Court finds that Plaintiff has not alleged a constitutional violation under binding precedent that would remove the instant case from the ambit of the discretionary function exception.

### B. *Subject-Matter Jurisdiction – ATA*

The Court also does not have subject-matter jurisdiction over Plaintiff's ATA claims. First, Plaintiff cannot rely on the FTCA to allege a cause of action under the ATA because "the FTCA was not intended to redress breaches of federal statutory duties." *Johnson v. Sawyer*, 47 F.3d 716, 727 (5th Cir. 1995) (en banc) (quoting *Sellfors v. United States*, 697 F.2d 1362, 1365 (11th Cir. 1983)). Second, Plaintiff cannot bring an independent ATA action because Congress has not

waived sovereign immunity for alleged violations of the ATA. Nonetheless, Plaintiff argues that the Geneva Convention[7] precludes Congress from retaining sovereign immunity for claims against the United States for violations of the ATA. This Court declines to find that the Geneva Convention preempts Congress's retention of sovereign immunity. "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text . . . and will not be implied." *Lewis v. Hunt*, 492 F.3d 565, 570 (5th Cir. 2007) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)). There is no language in the ATA indicating congressional intent to waive sovereign immunity. Rather, section 2337 of the ATA explicitly states that "[n]o action shall be maintained under section 2333 of this title against . . . the United States." 18 U.S.C. § 2337(1). The Court declines Plaintiff's invitation to find section 2337(1) unconstitutional. *See* Resp. 24.

### C. *Discovery Request*

Plaintiff requests that the Court delay ruling on a motion to dismiss until the Court permits Plaintiff to conduct discovery on issues pertaining to the discretionary function exception. The party seeking discovery bears the burden of showing its necessity. *Freeman v. United States*, 556 F.3d 326, 341 (5th Cir. 2009). Typically, the party seeking discovery meets this burden by alleging the "specific facts crucial to immunity which demonstrate[] a need for discovery." *Id.* at 342 (quoting *Kelly v. Syria Shell Petrol. Dev. B.V.*, 213 F.3d 841, 852 (5th Cir. 2000)). A party is not entitled to jurisdictional discovery if the requested discovery is not likely to produce the facts necessary to withstand a Rule 12(b)(1) motion. *Williamson v. U.S. Dep't of Agric.*, 815 F.2d 368, 382 (5th Cir. 1987). "This is particularly true where the party seeking discovery is attempting to disprove the applicability of an immunity-derived bar to suit; immunity is intended to shield the defendant from the burdens of defending the suit, including the burdens of discovery." *Sailboat*

---

[7] Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287.

*Bay Apts., LLC v. United States*, Civ. A. No. 14-2344, 2015 WL 2250114, at *6 (E.D. La. May 13, 2015) (citing *Arriba Ltd. v. Petróleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992)).

Here, Plaintiff contends that discovery would help determine whether an FBI agent assisted Simpson and Soofi in obtaining the weapons used in the attack, whether the FBI "allowed" the weapon that injured Plaintiff to be sold unlawfully to the terrorists, whether UCE-1 received authorization to engage in "Otherwise Illegal Activity," and to what extent UCE-1 coordinated with the terrorists in relation to the attack. Resp. 5. As to the first point, the Complaint never suggests that an FBI agent assisted Simpson and Soofi in obtaining weapons, and the Court declines to permit discovery on a theory that appears to be based on speculation. As to the other three points, the Court finds, based on its analysis above, that the requested discovery could not "reasonably be expected to reveal" conduct outside of the discretionary function exception. *See Mesa v. United States*, 123 F.3d 1435, 1439 (11th Cir. 1997). Therefore, the Court denies Plaintiff's request for jurisdictional discovery.

### D. *Failure to State a Claim*

Because the Court lacks subject-matter jurisdiction over the instant action, it does not reach Defendant's alternate motion to dismiss for failure to state a claim.

### IV. CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion to Dismiss without prejudice for lack of subject-matter jurisdiction.[8]

**SO ORDERED.**

SIGNED December 21, 2018.

**KAREN GREN SCHOLER
UNITED STATES DISTRICT JUDGE**

---

[8] *See Hix v. U.S. Army Corps. of Eng'rs*, 155 F. App'x 121, 128 (5th Cir. 2005) (dismissal for lack of subject-matter jurisdiction based on discretionary function exception should be without prejudice).